**BIOVAIL CORPORATION INTERNATIONAL,**
Plaintiff,

v.

Hoechst **AKTIENGESELLSCHAFT, Hoechst Marion Roussel, Inc., Hoechst Marion Roussel North America, Inc., Carderm Capital L.P., Horst Waesche, Daniel Camus, Richard J. Markham, Peter W. Ladell, Gerald P. Belle, and Jurgen Dormann, Defendants.**

**No. Civ.A. 98–1434(MTB).**

United States District Court,
D. New Jersey.

June 1, 1999.

Thomas M. Licata, Kelley Drye & Warren, Parsippany, New Jersey, Kevin J. McKenna, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, New Jersey, David W. MacGregor, Proskauer Rose, Clifton, New Jersey, for plaintiff.

Liza M. Walsh, Connell, Foley & Geiser, Roseland, New Jersey, for defendants Hoechst Aktiengesellschaft, Hoechst Marion Roussel, Inc., Hoechst Marion Roussel North, Daniel Camus, Richard J. Mark-

ham, Peter W. Ladell, Gerald P. Belle, and Jurgen Dormann.

Lindsey H. Taylor, Friedman Siegelbaum, Roseland, New Jersey, for defendant Carderm Capital L.P.

## OPINION

BARRY, District Judge. ·

Biovail Corporation International ("Biovail" or "plaintiff") filed a five-count complaint with this court on April 27, 1998. This matter comes before the court on a motion to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) filed by defendants Hoechst Aktiengesellschaft ("Hoechst AG"), Hoechst Marion Roussel, Inc. ("HMRI"), Hoechst Marion Roussel North America, Inc., and Carderm Capital L.P. ("Carderm") (collectively as "Hoechst defendants"). Defendants Horst Waesche ("Waesche"), Daniel Camus ("Camus"), Richard J. Markham ("Markham"), Peter W. Ladell ("Ladell"), Gerald P. Belle ("Belle"), and Jurgen Dormann ("Dormann") (collectively as "Individual Defendants") join in the motion to dismiss (thus, all defendants will be referred to collectively as "defendants" or "Hoechst") and have also filed a separate motion to dismiss stating independent grounds for dismissal of the claims levied against them. For the following reasons, this court will deny the motions.

### I. Statement of Facts

Biovail is a Canadian pharmaceutical company involved in the manufacture and development of drugs that treat chronic conditions such as high blood pressure. *See* Compl. ¶ 4. Defendants are also engaged in the production and sale of pharmaceutical products. *Id.* ¶¶ 5–10.

Marion Merrell Dow initially introduced the pioneer drug which used diltiazem, a calcium channel blocker, as an active ingredient to treat high blood pressure and angina. *Id.* ¶¶ 21–22. The brand name of the drug was Cardizem. *Id.* In June of 1993, Hoechst–Roussel Pharmaceuticals, Inc. ("HRP"), a subsidiary of Hoechst AG

and a company associated with Hoechst–USA, entered into a Rights Agreement with Biovail under which the companies would jointly develop diltiazem-based drugs that would compete with Cardizem. *Id.* ¶ 29. The first such product developed was a once-daily form of diltiazem to be sold under the name of Tiazac. *Id.* HRP filed a New Drug Application ("NDA") for Tiazac with the FDA certifying its safety and effectiveness. *Id.*

Much to Biovail's chagrin, in late 1994, Hoechst AG announced that it planned to acquire Marion Merrell Dow and thereafter HRP terminated its joint venture with Biovail. *Id.* ¶ 31. Biovail sued Hoechst AG and others for contract and antitrust violations and, on April 28, 1995, the parties entered into a settlement agreement and release ("Settlement Agreement"). *Id.* ¶¶ 32–33; *see also* Spears Decl., Exh. C. The Settlement Agreement provided, among other things, that Biovail was to be assigned the rights to the Tiazac NDA, *see* Compl. ¶ 35, and Hoechst AG, Hoechst–USA, and Carderm covenanted

> not to sue Biovail . . ., or initiate any regulatory proceedings or legal actions challenging or contesting in any manner whatsoever the Product with respect to any claim of patent infringement relating to the Product or regulatory approvals of the Product now or in the future.

*Id.* ¶ 34; Spears Decl., Exh. C at 14–15. "The Product" was defined in the Settlement Agreement as:

> certain formulations for a once daily, extended release medicine containing diltiazem hydrochloride as further defined in Section 1.01.32 of the Rights Agreement and any improvements thereto or any formulation thereof alone or in combination with at least one other active ingredient.

Compl. ¶ 34; Spears Decl., Exh. C at 1.

The Federal Trade Commission ("FTC") then initiated an investigation into the proposed acquisition of Marion Merrell Dow by Hoechst AG. *Id.* ¶ 36. This investiga-

tion was settled by a consent decree that became final on April 17, 1996 ("FTC Decree"). *Id.; see also* Compl., Exh. A; Spears Decl., Exh. D. In order to rectify the potential anticompetitive effects of the acquisition, the FTC ordered, *inter alia,* that Hoechst and Marion Merrell Dow give Biovail a right of reference to the pharmacology and toxicology data filed with the FDA in support of Marion Merrell Dow's NDA for Cardizem. More specifically, the FTC Decree provided that Hoechst AG:

> shall grant to Biovail the right of reference to the pharmacology, toxicology and animal reproductive toxicology data contained in [Marion Merrell Dow's] NDA No. 18–602 for Diltiazem on file with the FDA. [Hoechst AG] shall make the necessary filings with the FDA authorizing the FDA to refer to the appropriate section(s) of [Marion Merrell Dow's] NDA No. 18–602 for such data (including, but not limited to, pharmacology and toxicology data) in support of Biovail's NDA No. 20–401 for the Biovail Diltiazem Products, including any supplemental NDAs or related NDAs.

Spears Decl., Exh. D. at 3; *see also* Compl. ¶ 37. A right of reference is useful because it allows the referenced party to refer to and adopt data already filed with the FDA by a previous filer rather than submit independent data. *See* Compl. ¶ 37.

On December 18, 1995, a representative of Hoechst–USA, using Marion Merrell Dow letterhead, sent the FTC mandated "right of reference" letter to the FDA. *See* Compl. ¶ 55. It stated in part:

> Hoechst Marion Roussel, Inc. (formerly Marion Merrell Dow Inc.) ("HMR") hereby authorizes Biovail Corporation International ("Biovail") to reference the

pharmacology, toxicology and animal reproductive toxicology data contained in HMR's NDA 18–602 for diltiazem hydrochloride in support of Biovail's NDA No. 20–401 for a once-a-day dosage form of diltiazem hydrochloride, including any supplemental NDAs or NDAs related to that product.

Spears Decl., Exh. E ("reference letter").

On February 5, 1996, Biovail sought the FDA's opinion as to the scope of the reference letter. *See* Compl. ¶ 56. On April 8, 1996, the FDA replied:

> Specifically, you asked whether FDA believed that the authorization language in [the reference letter] is broad enough to encompass all future diltiazem submissions that Biovail might file.

> We have examined the language in the letter and believe that it is sufficiently broad to allow us to recognize a right of reference to the pharmacology, toxicology, and animal reproductive toxicology data contained in HMR's NDA 18–602 in any diltiazem hydrochloride new drug application or supplement that Biovail submits.

Golden Aff., Exh. H;[1] *see also* Compl. ¶¶ 56–57. HMR, however, wrote to the FDA on July 11, 1996 and informed it that "the right of reference previously granted [to Biovail] pertains only to the formulation originally submitted in NDA 20–401. No other formulations are allowed." Spears Aff., Exh. F. In addition, by letter of October 28, 1996, HMRI reiterated to the FDA that the right of reference granted to Biovail permitted reference only to obtain approval for the diltiazem formulation submitted in NDA 20–401 [Tiazac] and any NDA or supplement "for this same product." Spears Decl., Exh. G. "[N]o right of reference to the preclinical data on

---

1. This court will occasionally reference the exhibits attached to an affidavit submitted by William R. Golden, Jr. ("Golden Aff."). The Golden affidavit was not submitted in connection with this motion but was presented to the court in the context of a prior motion in this case. As no party disputes the contents of the documents attached to the Golden affidavit, and the substance of the documents are continually referenced in the complaint, this court will at times refer to these documents in order to more clearly explain the facts of an otherwise factually complex case.

diltiazem contained in NDA 18–602 would be permitted for [Biovail for] any one-a-day formulation of diltiazem not originally submitted in NDA 20–401." Spears Aff., Exh. G at 2. In light of this express limitation by Hoechst, on November 8, 1996, the FDA retracted its broader interpretation of the possible scope of the right of reference set forth in its letter of April 8, 1996. *See* Golden Aff., Exh. I at 3; *see also* Compl. ¶ 59.

Thus, in November 1997, when Biovail filed an NDA (No. 20–939) with the FDA for a generic version of Cardizem CD, the once-daily dosage form of Cardizem, the NDA was rejected. The FDA refused to file Biovail's NDA 20–939 for the following reasons:

NDA 20–939 contains no nonclinical pharmacology or toxicology data. It is your intent to rely on the right of reference for those data that was granted to you by Hoechst Marion Roussel ("HMR") to support the approval of your NDA 20–401. As we had informed you in our letter dated November 8, 1996 (enclosed), the right of reference that was granted to you by HMR for NDA 20–401 does not permit reference to HMR's NDA 18–602 for any once-daily diltiazem product that was not originally submitted to NDA 20–401. The diltiazem product covered by NDA 20–939 is different from the product covered by NDA 20–401. We therefore consider NDA 20–939 to be incomplete and can not be filed according to 21 C.F.R. 314.101(d)(3).

Golden Aff., Exh. I at 1.

Biovail also sought to have Tiazac approved in Canada by Canada's Health Protection Branch ("HPB"). *See* Compl. ¶ 41. Biovail states that on February 16, 1996 it was orally informed by a representative of the HPB that the efficacy and safety review had been successfully completed on Tiazac and that the review of the product monograph, or product labeling, would be completed within the next eight weeks. *See* Compl. ¶ 42. On March 11, 1996,

Hoechst Marion Roussel Canada ("Hoechst–Canada") sent a letter to the HPB expressing what Biovail asserts were "specious safety concerns about the non-bioequivalence of Tiazac to Cardizem CD." Compl. ¶ 47; *see also* Spears Decl., Exh. A. On April 12, 1996, Hoechst–Canada again wrote to the HPB, and Biovail alleges that Hoechst–Canada again raised "the same bogus safety concerns and intimat[ed] that HPB, *inter alia*, should delay or deny approval to Tiazac altogether on the ground that it was not bioequivalent to Cardizem CD." Compl. ¶ 47; *see also* Spears Decl., Exh. B.

On May 22, 1996, the HPB decided not to approve Tiazac. *See* Compl. ¶ 45. The HPB decision was eventually overturned and Tiazac was ultimately approved for use in Canada. *See* Compl. ¶¶ 51–52.

On June 19, 1997, Biovail filed an Abbreviated Drug Application ("ANDA") (No. 75–1169) with the FDA for a generic form of Cardizem CD and an accompanying Paragraph IV Certification. *Id.* ¶ 61. Filing an ANDA, as opposed to a NDA, is an alternative means of obtaining FDA approval. The Hatch–Waxman Amendments to the Food, Drug & Cosmetics Act state that a party seeking approval of a generic drug may file an ANDA with the FDA and rely upon the findings of safety and effectiveness set forth in the pioneer drug owner's NDA. *See* Compl. ¶ 16; *see also* 21 U.S.C. § 355(j) (1997). In addition to filing the ANDA, the applicant must certify either that: (1) no patent for the pioneer drug has been filed; (2) the pioneer drug patent has expired; (3) the pioneer drug patent will expire on a certain date; or (4) the pioneer drug patent is invalid or will not be infringed by the proposed generic drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii). If the applicant files a so-called "Paragraph IV Certification," the owner of the pioneer drug has forty-five days in which to file a patent infringement suit against the applicant. *See* Compl. ¶ 16; *see also* 21 U.S.C. § 355(j)(5)(B)(iii). If no action is initiated within forty-five days, the FDA approval

proceeds. *Id.* If, however, an infringement suit is timely filed, final FDA approval is automatically stayed for thirty months ("thirty-month waiting period") or until a final judicial determination of non-infringement, whichever occurs first. *Id.*

On August 1, 1997, a representative of HMRI met with Biovail to discuss Biovail's ANDA for its generic form of Cardizem CD that it had filed with the FDA. *See* Compl. ¶ 67. According to Biovail, HMRI "publicly threatened" to initiate a patent infringement suit against it. *Id.* ¶ 68. During the meeting, the HMRI representative allegedly advanced the following proposal: Hoechst would refrain from initiating a patent infringement suit against Biovail, would license a specially designated product to Biovail, and would advance substantial funds for the development and approval of that product. In return, Biovail would delay the launch of its generic form of Cardizem CD until after July 1999. *Id.* ¶ 69. According to Biovail, the HMRI representative explained that the delay was desirable because, one, Hoechst had represented to its investors that Hoechst would be able to take advantage of its United States monopoly over Cardizem CD until late 1999, and, two, Hoechst was planning to introduce new drug products by the summer of 1999 which would lessen HMRI's dependence on the Cardizem CD revenues. *Id.* ¶ 70. Biovail rejected the proposal. *Id.* ¶ 72. Hoechst did not initiate a patent infringement suit against Biovail. *Id.*

Finally, Biovail alleges that Hoechst was also negotiating with another pharmaceutical company, Andrx Pharmaceuticals, Inc. ("Andrx"), regarding its introduction of a generic form of Cardizem CD. *Id.* ¶ 73. Andrx had filed its ANDA for a generic version of Cardizem CD ("Andrx's generic") along with its Paragraph IV Certification before Biovail filed its ANDA. *Id.* ¶ 75. Under the law, a previous party who files an ANDA and a Paragraph IV Certification for its generic drug—here, Andrx—is granted a 180-day exclusivity period within which to market its drug without competition from subsequent ANDA applicants. *See* 21 U.S.C. § 355(j)(5)(B)(iv); *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C.Cir.1998). This 180-day exclusivity period commences when either (1) the previous applicant begins to commercially market the drug or (2) a court decides that the pioneer drug patent that is subject to the Paragraph IV Certification is either invalid or not infringed, whichever is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iv); *Mova*, 140 F.3d at 1065.

On January 31, 1996, within the appropriate time period—namely, forty-five days from the time Hoechst received Andrx's Paragraph IV Certification—Hoechst–USA and Carderm filed a patent infringement suit against Andrx in the Southern District of Florida. *Id.* ¶ 76. On September 15, 1997, while the suit was, and still presumably is, pending, the FDA gave tentative approval to Andrx's generic. *Id.* ¶ 76. Because Andrx's generic was tentatively approved by the FDA, meaning that it was approved in terms of efficacy and safety, Andrx was entitled to introduce its generic into the market after the thirty-month waiting period expired, or on July 3, 1998. *Id.* On September 26, 1997, Hoechst–USA and Andrx announced a partial settlement agreement ("Andrx Agreement") whereby Hoechst–USA would make quarterly payments of ten million dollars to Andrx beginning July 3, 1998 and until the patent case, including appeals, was over. *Id.* ¶ 79. In exchange, Andrx agreed to forestall introduction of its generic Cardizem CD until that time. *Id.*

On March 27, 1998, Biovail filed this action alleging that all defendants (1) violated Section 1 of the Sherman Act by unreasonably restraining trade in the distribution and sale of sustained release diltiazem prescription drugs and the generic forms of those drugs, which included the Andrx Agreement (Count One); (2) violated Section 2 of the Sherman Act by mono-

polizing and attempting to monopolize the market for sustained release diltiazem prescription drugs and the sub-market for the generic versions of those drugs in the United States (Count Two); (3) violated the New Jersey Consumer Fraud Act by engaging in deceptive and unconscionable commercial practices such as, *inter alia,* breaching the Settlement Agreement and violating the FTC Decree (Count Four); and (4) engaged in unfair competition by their actions (Count Five). In addition, Biovail alleges that defendants Hoechst–AG, Hoechst–USA and Carderm breached the Settlement Agreement by taking legal action before the Canadian HPB and the FDA to delay the regulatory approvals needed for Biovail's diltiazem products (Count Three).

Defendants move to dismiss Biovail's entire complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Biovail has voluntarily dismissed Count Four. *See* Pl.Opp.Br. at 5, n. 8.

## II. Discussion

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) will be granted if the court finds "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations in the complaint must be accepted as true and all reasonable inferences must be drawn in favor of the non-moving party. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991). With this standard in mind, this court will consider each of the remaining counts of Biovail's complaint before concluding, as it must, that there is little if anything in this extraordinarily complicated case that is "beyond doubt."

### A. Antitrust Claims

In Counts One and Two, Biovail alleges that defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2

(1997). Although the complaint is not a model of clarity, it appears as though Biovail's antitrust claims are premised on essentially five sets of factual allegations.

First, Biovail asserts that defendants improperly interfered with the FDA approval process for Biovail's generic form of Cardizem CD by repudiating the FTC Decree. *See* Compl. ¶¶ 55–64. Second, Biovail points to the "collusive and anticompetitive agreement" that defendants made with Andrx whereby defendants agreed to pay Andrx $40 million per year to refrain from marketing its generic version of Cardizem CD until the conclusion of the patent infringement suit filed by defendants against Andrx (including appeals). *See* Compl. ¶¶ 73–84. Third, Biovail contends that defendants have interfered with the Canadian regulatory process with the intent to derail or substantially delay the approval of Tiazac by the Canadian HPB. *See* Compl. ¶ 41. Fourth, Biovail alleges that defendants "publicly threatened" to bring a patent infringement suit against Biovail challenging Biovail's ANDA filed for its generic form of Cardizem CD despite the fact that the FTC Decree contained a prohibition against such a suit. *Id.* ¶ 68. And, finally, Biovail asserts that at a meeting on August 1, 1997, defendants sought Biovail's cooperation to engage in "an illegal restraint of trade" by asking Biovail to agree to delay the launch of its generic Cardizem CD until at least July 1999 in exchange for Hoechst refraining from instituting the patent infringement suit—a request which Biovail rejected. *Id.* ¶ 69.

■ Defendants take issue with each of the factual bases for Biovail's antitrust claims and have set forth separate arguments as to why each allegation must be dismissed. This court is troubled, however, by defendants' approach in light of the Supreme Court's clear mandate in *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 698, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore,*

the Court admonished the Court of Appeals for the Ninth Circuit for treating plaintiff's allegations regarding its antitrust claim "as if they were five completely separate and unrelated lawsuits." *Id.* at 698–99, 82 S.Ct. 1404. The Court directed that:

> plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.

*Id.* at 699, 82 S.Ct. 1404. In light of this directive, therefore, defendants' behavior will be evaluated, and all inferences will be drawn, in light of the allegations as a whole.

This does not mean, however, that this court will ignore the numerous objections raised by defendants to Biovail's complaint. "[I]t is clear from the facts and reasoning of *Continental Ore* itself that the Supreme Court never intended [this oft-quoted] language to bar a probing analysis of antitrust … claims." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 513 F.Supp. 1100, 1167 (E.D.Pa.1981), *rev'd sub nom. on other grounds,* 723 F.2d 238 (1983). Indeed, where numerous claims of anticompetitive conduct are set forth in support of a Sherman Act claim, many courts, including the Supreme Court itself in *Continental Ore,* have addressed the allegations separately in order to facilitate an orderly evaluation of the objections raised. *See Continental Ore,* 370 U.S. at 700–708, 82 S.Ct. 1404 (carefully analyzing the record with respect to three of the four allegedly improper ventures, and concluding separately with respect to each that there was enough evidence of causation to preclude a directed verdict); *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76, 95 n. 28 (2d Cir.1981) ("Although the logical presentation of our holding has required us to treat each of Northeastern's claims of anticompetitive conduct separately, we have not ignored Continental Ore's edict. We have found, however, that in numerous critical respects Northeastern's

proof was utterly lacking. Under such circumstances, treating Northeastern's claims collectively cannot have any synergistic effect."), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *California Computer Prods., Inc. v. International Business Machines Corp.,* 613 F.2d 727, 745 (9th Cir.1979) (noting that "[t]he number of legal and evidentiary issues has required us to consider each instance of IBM's alleged monopolizing conduct separately for purposes of analytical clarity"). This court will, therefore, examine the distinct factual allegations and address defendants' specific objections, keeping in mind the allegations as a whole, as the Supreme Court has directed.

■ A related point. In its effort to compartamentalize Biovail's factual allegations, defendants contend, at various points in their brief, that one particular allegation or another did not cause Biovail injury and, therefore, must be dismissed. It is, of course, correct that antitrust injury must be shown before a private party has standing to bring an antitrust claim. *See Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,* 118 F.3d 178, 182 (3rd Cir.1997). The allegations, however, under *Continental Ore,* should not be so "tightly compartmentaliz[ed]." This court will not, therefore, consider whether each allegation resulted in antitrust injury. Rather, the court will first examine whether an antitrust violation has been alleged; then, if a violation has been alleged, the court will examine whether—as a result of all of the violations alleged—Biovail has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (defining antitrust injury).

### 1. Sherman Act Claims

In Count One of its complaint, Biovail alleges that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by

conspiring among themselves and with co-conspirators, including Andrx, to fix artificially high prices and to unreasonably restrain interstate trade and commerce in the distribution of sustained release diltiazem drugs used for hypertension and angina, as well as the generic version of these products by, *inter alia,* entering into the Andrx Agreement ("Section 1 claim"). *See* Compl. ¶ 96.

Section 1 of Title 15 of the United States Code provides in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1 (1997). Thus, to state a Section 1 claim, Biovail must allege (1) a conspiracy (2) to unreasonably restrain trade. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 212 (3d Cir. 1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 (3d Cir.1991). To determine whether conduct is unreasonable under Section 1, courts typically apply what has been called the "rule of reason," i.e. "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Some types of restraint, however, have been found to be *per se* illegal as they "would always or almost always tend to restrict competition and decrease output." *Id.* (citation and quotations omitted).[2]

Biovail alleges in Count Two that defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2 (1997), by engaging in exclusionary, predatory and anticompetitive acts with the specific intent to monopolize the sustained release diltiazem prescription drug market and the sub-market for the generic version in the United States, and have achieved a "dangerous probability" of success in achieving such a monopoly ("Section 2 claim"). *See* Compl. ¶ 98.

Section 2 of the Sherman Act sanctions those who monopolize or attempt to monopolize. *See* 15 U.S.C. § 2.[3] To state a claim for monopolizing under Section 2, Biovail must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 437 (3d Cir.1997) (citation omitted), *cert. denied sub. nom,* —— U.S. ——, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998). To demonstrate attempted monopolization, Biovail must show "(1) that [defendants] engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (citation omitted).[4]

In support of its Section 2 claim, Biovail points out that defendants have either obtained monopoly power or are dangerously close to achieving monopoly power as de-

---

**2.** Price fixing, boycotts, horizontal market divisions, and certain tying arrangements have been found to be *per se* violations of the Sherman Act. *See Mylan Laboratories, Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1061 n. 5 (D.Md.1991)

**3.** 15 U.S.C. § 2 provides in part:
Every person who shall monopolize, or attempt to monopolize, or combine with any

other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony.

**4.** An effect on interstate commerce must also be shown to maintain either a Section 1 or Section 2 claim, *see Fuentes,* 946 F.2d at 198, but the parties do not dispute that this element has been satisfied.

fendants' sales of once-a-day and twice-a-day forms of sustained release diltiazem products represent over 80% of the market share in the United States. *See* Compl. ¶¶ 26, 28. Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The existence of monopoly power "ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). A reasonable person could certainly find—and defendants do not dispute at this point—that defendants' 80% market share sufficiently shows that defendants have—or are dangerously close to having—monopoly power over the sustained release diltiazem market in the United States. *Cf. American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (stating that "over two-thirds of the entire domestic field of cigarettes, and [ ] over 80% of the field of comparable cigarettes" constituted a "substantial monopoly").

The inquiry with respect to Biovail's Section 2 claim does not end here, however. The next question is whether Biovail has adequately pleaded that defendants either acted wilfully to acquire or maintain monopoly power or engaged in predatory or anticompetitive conduct with a specific intent to monopolize. In addition, with respect to Biovail's Section 1 claim, because defendants have not disputed that Biovail has alleged "concerted action," this court must ascertain whether Biovail has sufficiently alleged that defendants unreasonably restrained trade. This court will, therefore, examine the factual allegations set forth by Biovail to determine whether they demonstrate an unreasonable restraint of trade and/or a wilful attempt to maintain or obtain monopoly power. As was stated previously, this court will examine each of the five sets of allegations separately in order to address defendants' concerns but will evaluate each allegation in the context of the antitrust claims as a whole.

#### a. The FTC Decree

In support of its antitrust claims, Biovail first points to defendants' behavior with respect to the FTC Decree. Biovail asserts that defendants impermissibly interfered with the FDA approval process for Biovail's generic form of Cardizem CD by violating the FTC Decree. By informing the FDA that Biovail was not authorized to use the reference letter for Biovail's generic product, defendants, Biovail alleges, impermissibly curtailed the effectiveness of the FTC Decree which was designed to facilitate competition in the market for diltiazem products. *See* Compl. ¶¶ 55–64.

Defendants argue that Biovail's antitrust claims cannot be based upon its assertion that defendants repudiated the FTC Decree because: (1) Biovail lacks standing to enforce the FTC Decree even collaterally as part of its antitrust claim; (2) Biovail's controversy concerning the FTC Decree is not ripe; and (3) defendants' letters to the FDA did not breach the Settlement Agreement.

■ This court agrees that Biovail does not have standing to enforce the FTC Decree. In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court reiterated the well-settled rule that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it, even though they were intended to be benefited by it." *Id.* at 750, 95 S.Ct. 1917.

This court rejects Biovail's argument that it has standing to enforce the FTC Decree because it is an intended third party beneficiary of the decree. Biovail asserts that *Blue Chip Stamps* and its progeny only foreclose enforcement actions by incidental beneficiaries but allow noncompliance actions brought by intended beneficiaries. Because the FTC Decree explicitly singles out Biovail and grants it

certain rights under the decree including the availability of a right of reference, Biovail asserts that it is an intended beneficiary and has standing to enforce the decree. *See* Pl.Opp. Br. at 47–50.

Biovail is correct, in a general sense, that despite the broad language of the *Blue Chip Stamps,* rule, some courts have narrowed its reach and allowed intended beneficiaries to enforce consent decrees. *See Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 288 (D.C.Cir.1993) (holding that *Blue Chip Stamps* only prohibits incidental beneficiaries from suing to enforce a consent decree); *Hook v. Arizona Dep't of Corrections,* 972 F.2d 1012, 1014 (9th Cir. 1992) (holding that "intended third party beneficiaries of a consent decree have standing to enforce the decree"); *Hodges v. Public Building Comm'n of Chicago,* 864 F.Supp. 1493, 1508 (N.D.Ill.1994) ("courts have created an exception for would-be plaintiffs who are the intended, versus incidental, third party beneficiaries of the decree"). This exception, however, has not been uniformly adopted. The Court of Appeals for the Sixth Circuit, for instance, rejected the intended beneficiary exception because "[t]he plain language of *Blue Chip* indicates that even intended third-party beneficiaries of a consent decree lack standing to enforce its terms." *Aiken v. City of Memphis,* 37 F.3d 1155, 1168 (6th Cir.1994). Until the Supreme Court revisits its unequivocal language, the court reasoned, it would not join the courts which have created an exception for intended beneficiaries. *See id.*

▮ Even assuming that this court were to allow an exception for intended beneficiaries, however, this exception would not clothe Biovail with standing to enforce the FTC Decree for the reason that the exception is very narrowly construed in the area of government consent decrees and particularly government antitrust consent decrees. Courts are "more loath to allow third parties to enforce consent decrees when the government is involved...." *SEC v. Prudential Securities Inc.,* 136 F.3d 153, 158 (D.C.Cir.1998); *see also Hook,* 972 F.2d at 1015 (distinguishing government consent decrees because the government knows at the time it enters into the decrees that it is well-settled that only the government can enforce its own decrees); *Hodges,* 864 F.Supp. at 1508 (noting that the intended beneficiary exception "does not apply to consent decrees resulting from actions brought by the government"). Therefore, some courts have held, correctly in this court's view, that to have standing as a nonparty to enforce a government consent decree, one must show that the government explicitly authorized third party enforcement. *See Rafferty v. NYNEX Corp.,* 60 F.3d 844, 849 (D.C.Cir.1995) (holding that "[u]nless a government consent decree stipulates that it may be enforced by a third party beneficiary, only the parties to the decree can seek enforcement of it"); *Beckett,* 995 F.2d at 288 (stating that "[o]nly the Government can seek enforcement of its consent decrees; therefore, even if the Government intended its consent decree to benefit a third party, that party could not enforce it unless the decree so provided") (citations omitted).

This additional requirement is imposed because the government is presumed to be acting to benefit the general public interest and, thus, "third party beneficiaries of a[g]overnment contract are generally assumed to be merely incidental beneficiaries...." *Beckett,* 995 F.2d at 288 (citing to *Restatement (Second) of Contracts,* § 313(2) & cmt. a (1979)); *see also Prudential,* 136 F.3d at 158. Therefore, to overcome the presumption that the government was acting solely in the general public interest, a nonparty who wishes to enforce a government consent decree as an intended third party beneficiary must show not "only [that] the contracting parties intended to confer a benefit directly on the third parties, but also [that] the parties intended the third party to be able to sue to protect that benefit." *Prudential,* 136 F.3d at 159.

■ While the FTC Decree does single out Biovail to receive certain benefits such as a right of reference, the decree was not entered into for Biovail's benefit. Rather, the decree was entered into for the benefit of the public interest in order to remedy "alleged violations of federal law prohibiting unfair or deceptive acts and practices and unfair methods of competition arising from the $7.1 billion merger of Hoechst AG and Marion Merrell Dow, Inc." Spears Decl., Exh. D at 1. It provided that Hoechst AG and Merrell Dow would do numerous things to accomplish this goal, only one of which included granting Biovail a right of reference. As another court aptly stated in a case with strikingly similar facts:

> Plaintiff is simply wrong in contending that the decree at issue in this case was entered for its benefit. Rather the decree represented the [government's] estimation of what the public interest required in order to make the . . . merger acceptable, and the benefits enjoyed by [the nonparty] under the decree were a mere means to this end.

*National Union Electric Corp. v. Emerson Electric Corp.*, 1981 WL 2132 at *3 (N.D.Ill. July 23, 1981) (holding that a nonparty to an antitrust consent decree resulting from a challenge to a merger did not have standing to enforce the decree even though the decree provided that the nonparty would receive specified benefits under the decree).

In addition, and more importantly, nothing in the FTC Decree evidences the government's intent to grant Biovail the right to *enforce* the decree. *See Hodges,* 864 F.Supp. at 1509 (stating that "[c]ourts look to the language of the consent decree itself to determine whether a clear intent to permit third parties to enforce the decree exists"). Indeed, the FTC has initiated its own proceedings to address purported noncompliance by Hoechst with respect to the right of reference. *See* Compl. ¶ 63 (noting the FTC's enforcement efforts and pointing to the fact that "[t]he FTC has

issued a subpoena to Hoechst–USA in order to obtain information relevant to Hoechst's violations of the FTC Consent Order").

Finally, it is significant that the government consent decree at issue here is an *antitrust* consent decree. "Cases involving antitrust consent decrees have hewed closely to the *Blue Chip* rule barring any person not directly participating in the consent decree from suing to enforce its terms." *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 654 F.Supp. 1419, 1437 (D.Del.1987), *aff'd,* 988 F.2d 386 (3d Cir.), *cert. denied,* 510 U.S. 908, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993); *see also United States v. American Society of Composers, Authors and Publishers,* 341 F.2d 1003, 1008 (2d Cir.) ("the government is the sole proper party to seek enforcement of government antitrust decrees"), *cert. denied,* 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965). Thus, even courts that have allowed the intended beneficiary exception have pointed out that government antitrust consent decrees are distinguishable. *See Beckett,* 995 F.2d at 288 (distinguishing consent decree between private parties from consent decrees resulting from a civil antitrust action brought by the government); *Coca–Cola,* 654 F.Supp. at 1437–38 (discussing the different rationales for limited standing in the context of antitrust consent decrees as opposed to other consent decrees such as those arising from civil rights violations). Indeed, Biovail has not cited a single case in which a nonparty to a government antitrust consent decree was permitted to enforce the decree. For all of these reasons, this court finds that Biovail does not have standing to enforce the FTC Decree.

■ Contrary to defendants' contentions, however, this does not mean that defendants' behavior with respect to the FTC Decree cannot be considered, along with all of the other allegations, as support for Biovail's antitrust ·claims. Biovail's standing to enforce the consent decree is distinct from its standing to maintain an

antitrust claim. This court finds the Court of Appeals for the Third Circuit's discussion in *Ford Motor Company v. Summit Motor Products, Inc.,* 930 F.2d 277, 285–286 (3d Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991), to be helpful. In *Summit Motor Products,* the Court was confronted with a RICO claim based in part on a violation of a divestiture order entered as a result of an antitrust suit brought by the United States Department of Justice. *Id.* at 280, 285. The Court recognized that under *Blue Chip Stamps,* "only the parties to a court order or decree have the power to enforce it." *Id.* at 285 (citing to *Blue Chip Stamps,* 421 U.S. at 750, 95 S.Ct. 1917). It pointed out, however, that the RICO statute only required an injury to one's business or property in order to maintain a RICO claim—"[t]he standing inquiry in any civil RICO case depends solely on demonstrating injury to business or property, and not on satisfying any standing requirement attached to the predicate act." *Id.* at 285–86. Thus, the Court concluded that even though the party did not have standing under *Blue Chip Stamps* to enforce the divestiture order, it nonetheless had standing to maintain a RICO claim based upon a violation of that order. *Id.* This was so even though the Court acknowledged that "the success of the RICO claim largely depends on what could be termed an enforcement of the [divestiture order]." *Id.* at 285.

Likewise, in order to maintain an antitrust claim, a private party must have been "injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15(a). As with RICO, there is no express requirement that the party satisfy a standing requirement that may attach to one of the anticompetitive acts set forth in support of the antitrust claim. Thus, even though Biovail does not have standing to enforce the FTC Decree, it may premise its antitrust claims upon violations of the decree. *See also Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1003 n. 5 (3d

Cir.1994) (noting in antitrust case that "[w]e may of course, consider evidence of activity necessitating the entry of the consent decree, as well as the terms of the consent decree itself, as part of the overall picture or potential evidence of a pattern of conduct"), *cert. denied,* 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995).

Defendants next argue that any allegations based upon the FTC Decree are not ripe because Biovail did not attempt to invoke the right of reference. *See* Defs. Br. at 16–17. Defendants are wrong. In November 1997, Biovail attempted to file a NDA (No. 20–939) with the FDA for a generic version of Cardizem CD relying upon the right of reference. *See* Golden Aff., Exh. I at 1. The FDA refused to file Biovail's NDA 20–939 because it contained no pharmacology or toxicology data and the right of reference did not permit reference for that NDA. *Id.*

Finally, defendants argue that the letters they sent to the FDA with respect to the right of reference did not violate the Settlement Agreement, and, therefore, that those letters cannot form the basis for Biovail's antitrust claim because the conduct was not independently wrongful. More specifically, defendants direct this court's attention to the Settlement Agreement between the parties, which states that defendants covenant

> not to sue Biovail ... or initiate any regulatory proceedings or legal actions challenging or contesting in any manner whatsoever the Product with respect to any claim of patent infringement relating to the Product or regulatory approvals of the Product now or in the future.

Spears Decl., Exh. C at 15. Because the letters sent to the FDA do not fall within the category of suing or initiating a regulatory proceeding or legal action, defendants argue, they have not violated the Settlement Agreement and, therefore, that allegation does not constitute wrongful conduct sufficient to support an antitrust

claim. *See* Defs.Br. at 17–18. This court does not agree.

While an examination of the express provisions of the Settlement Agreement bear on the question of whether defendants breached that agreement (i.e. Count Three), the fact that the letters to the FDA may not fall within the type of conduct expressly proscribed by the Settlement Agreement does not mean that the conduct cannot support Biovail's antitrust claims. If it can ultimately be shown, as Biovail alleges, that defendants intentionally narrowed the scope of the right of reference from what they thought was directed by the FTC in order to keep Biovail's generic product from being approved, coupled with various other anticompetitive activities, a reasonable trier of fact could find that defendants were unreasonably restraining trade or wilfully endeavoring to maintain or obtain monopoly power over the diltiazem market in the United States. Defendants' argument that conduct cannot form the basis for an antitrust claim if it is not "wrongful" for reasons extrinsic to the antitrust laws is simply incorrect. *See* Defs.Br. at 14, n. 14. As the Supreme Court stated in the context of evaluating a Section 2 claim,

> It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.

*American Tobacco Co.;* 328 U.S. at 809, 66 S.Ct. 1125. Thus, the letters to the FDA can support Biovail's antitrust claims regardless of whether they were explicitly proscribed by the Settlement Agreement.

#### b. The Andrx Agreement

■ Biovail next points to the Andrx Agreement in support of its antitrust claims. Again, the Andrx Agreement re-fers to defendants' agreement with Andrx to pay Andrx $40 million per year to refrain from marketing its generic version of Cardizem CD until the conclusion of the patent infringement suit filed by defendants against Andrx (inclusive of appeals). *See* Compl. ¶¶ 75, 79. The significance of this agreement and the import of Biovail's claim is borne out by examining the relevant statutory framework.

As was discussed previously, when an applicant such as Andrx submits an ANDA and a Paragraph IV Certification, the patent holder, here defendants, has forty-five days within which to initiate a patent infringement suit. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Once the suit is filed, final FDA approval of the generic drug is deferred for thirty months to allow the parties to determine the patent rights. *See id.* As Andrx filed its ANDA and Paragraph IV Certification for its generic form of Cardizem CD and defendants filed a timely patent suit on January 31, 1996, final FDA approval for Andrx's generic was deferred, under the thirty-month waiting period, until July 3, 1998. Because Andrx's generic was tentatively approved by the FDA on September 15, 1997—meaning that, aside from potential patent issues, the product is an approved generic drug—Andrx would, therefore, be allowed to market the product on July 3, 1998.

Under the law, a previous party who files an ANDA and a Paragraph IV Certification for its generic drug—here, Andrx— is granted a 180–day exclusivity period within which to market its drug without competition from subsequent ANDA applicants. *See* 21 U.S.C. § 355(j)(5)(B)(iv); *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1064 (D.C.Cir.1998). The 180–day exclusivity period commences when either (1) the previous applicant begins to commercially market the drug or (2) a court decides that the pioneer drug patent that is subject to the Paragraph IV Certification is either invalid or not infringed, whichever is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iv). By

paying Andrx not to commercially market its generic product, Biovail argues, defendants are delaying the triggering of—and hence the conclusion of—Andrx's exclusivity period until the commencement of the patent infringement suit between Andrx and defendants. Therefore, the Andrx Agreement restrains trade, Biovail alleges, as it prevents other companies, including Biovail, from marketing its generic diltiazem drugs and allows defendants to continue to reap the substantial profits resulting from its then-monopoly. *See* Compl. ¶ 80. Andrx also allegedly benefits from the collusive arrangement because it already markets a generic version of Dilacor XR, another sustained release diltiazem product, and foreclosing other generic diltiazem products from entering the market would shield it from competition. *See* Compl. ¶ 81.

Defendants argue that these allegations cannot support Biovail's antitrust claims for three reasons: (1) the claims are not ripe and the injury to Biovail is speculative because Biovail has not yet been granted tentative approval by the FDA for its generic form of Cardizem and, therefore, it could not enter the market in any event; (2) Biovail's purported injury is speculative because, regardless of the Andrx Agreement, Andrx may have simply opted not to enter the market until the conclusion of the patent infringement suit so as not to risk potentially devastating damages if its product is found later to be infringing; and (3) Biovail's claim consists of nothing more than frustration with the exclusivity period granted by the Hatch–Waxman amendments and interpreted by the *Mova* court.

Again, this court will not evaluate whether each and every anticompetitive act upon which Biovail's antitrust claims are based directly caused Biovail injury. Instead, it will determine whether Biovail was injured by the anticompetitive conduct as a whole, an analysis the court will refrain from conducting until it is established that an antitrust violation has been pleaded. Viewing the facts which bear on the alleged speculative nature of Biovail's injury in the light most favorable to Biovail, it is clear to this court that a reasonable trier of fact could conclude that an agreement between two competitors to delay the applicability of an exclusivity period for the purpose of keeping another competitor out of the market is an unreasonable restraint of trade or a wilful attempt to maintain or obtain a monopoly.[5]

Defendants' next argument can be disposed of quickly. Defendants argue that Biovail's antitrust claim is speculative because it is unreasonable to assume that Andrx would market its generic product before the conclusion of the patent infringement suit even absent the Andrx Agreement. *See* Defs.Br. at 28. Defendants point to the FDA's observation that "a prudent ANDA applicant" may wish to wait until the final appeal of the patent infringement suit is concluded before beginning to market the product to avoid the risk of potential damages if their product is later found to be infringing. *Id.* Thus, defendants argue, it is unreasonable for Biovail to assume that absent the Andrx Agreement, Andrx would be marketing its generic product and hence "using up" its 180–day exclusivity period. *Id.*

These are very persuasive arguments which may ultimately sway the trier of fact. However, on a motion to dismiss, this court must view all allegations in the light most favorable to the non-moving party. Thus, while it is possible that Andrx is not marketing its generic product because it does not want to risk potential patent infringement damages, it is also *certainly* possible that Andrx is not marketing its generic product—and hence stalling the exclusivity period—because defendants are paying it forty million dollars

---

**5.** It is interesting to note that, according to Biovail, the FTC is currently investigating the Andrx Agreement. *See* Pl.Opp.Br. at 15 n. 25.

a year not to do so. This court simply cannot make this call on the pleadings.

Finally, this court does not agree with defendants' last argument that Biovail's objection to the Andrx Agreement is nothing more than a frustration with the statutory exclusivity period as interpreted in *Mova.* In *Mova,* the Court of Appeals for the District of Columbia Circuit held that the FDA regulation, 21 C.F.R. § 314.107(c)(1), was unenforceable because it was inconsistent with the plain language of 21 U.S.C. § 355(j)(5)(B)(iv). *See Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060 (D.C.Cir.1998). The FDA regulation had added a requirement before the 180-day exclusivity period began to run: namely, that the first applicant must have "successfully defended against a suit for patent infringement" (referred to as the "successful defense requirement"). *Id.* at 1065 (quoting 21 C.F.R. § 314.107(c)(1)). The Court rejected the added requirement and concluded that all that Congress required for the triggering of the 180-exclusivity period was, one, the first commercial marketing of the drug or, two, a court decision that the patent was invalid or not infringed. *See Mova,* 140 F.3d at 1065, 1074; *see also Granutec, Inc. v. Shalala,* 139 F.3d 889, 1998 WL 153410 at *6 (4th Cir. Apr.3, 1998) (unpublished decision of the Court of Appeals for the Fourth Circuit reaching the same conclusion).

Although Biovail clearly does not agree with the decision in *Mova* and, indeed, filed an *amicus* brief in that case, *see Mova,* 140 F.3d at 1072 n. 14, it is not contesting either the statutory 180-day exclusivity period or *Mova* here. Rather, Biovail's claim reflects its contention that defendants are taking advantage of the exclusivity period in an anticompetitive manner. *See Woods Exploration & Producing Co. v. Aluminum Co. of Am.,* 438 F.2d 1286, 1303 (5th Cir.1971) (holding that actions taken to "subvert" a regulatory scheme "for anticompetitive purposes" are subject to the antitrust laws), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30

L.Ed.2d 736 (1972). Indeed, it could be said that the Andrx Agreement falls squarely within what the court in *Mova* speculated would be an abuse of the statute, namely,

> the first applicant could in theory wait indefinitely to begin selling its product, and thereby block all sales by later applicants. This unfortunate scenario could happen, for instance, if the first applicant colludes with the pioneer drug company to eliminate generic competition[ ]....

*Mova,* 140 F.3d at 1067.

### c. Interference with the Canadian Approval Process

Biovail also contends that defendants have interfered with the Canadian regulatory process with the intent to derail, or substantially delay, the approval of Tiazac by the Canadian HPB. Compl. ¶ 41. The interference allegedly consisted of defendants sending two letters to the HPB expressing "specious safety concerns about the non-bioequivalence of Tiazac to Cardizem CD." Id. ¶ 47. Defendants allegedly expressed these "specious" concerns even though they knew that (1) no legitimate safety concern existed as evidenced by the fact that defendants had initially filed the original NDA with the FDA for Tiazac and certified that it was safe and effective for hypertension as well as the fact that it had earlier been approved by the FDA, and (2) bioequivalency was not an issue because Tiazac was not a generic version of Cardizem CD and had an altogether different mode of delivery. *Id.* ¶¶ 46, 48. Defendants' interference, causing a delay in the HPB approval process for over a year, was allegedly for the "sole purpose" of "preserving [defendants'] monopoly over the sustained release diltiazem products both in the United States and Canada." *Id.* ¶¶ 50, 52. Raising these specious safety concerns was also allegedly aimed at making it more difficult for Biovail to market and sell Tiazac in the United States as "similar bogus concerns were

voiced by the sales representatives of defendant Hoechst–USA in the United States." *Id.* ¶ 54.

Defendants claim that Biovail's allegation that they impermissibly interfered with the Canadian regulatory process for the approval of Tiazac cannot form the basis for Biovail's antitrust claims for essentially three reasons:[6] (1) Biovail fails to identify which comments contained in the letters to the HPB are false; (2) the letters did not constitute the "initiation" of a "regulatory proceeding" or "legal action" as prescribed by the Settlement Agreement; and (3) Biovail cannot establish the chain of causation between defendants' actions in sending the letters to the HPB and Biovail's injury. *See* Defs. Reply Br. at 8–10.

Defendants' first contention is unpersuasive. At this juncture, Biovail need not establish precisely which comments in the letters were—and specifically how they were—false or misleading. Unlike fraud claims, plaintiff need not plead its antitrust claims with particularity. *See MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 976 (7th Cir.1995) ("[A]n antitrust plaintiff need not include 'the particulars of [its] claim' to survive a motion to dismiss. It is instead sufficient for the plaintiff to include in its complaint only 'a short and plain statement of the claim' showing an entitlement to relief.") (citations omitted).

It is, therefore, sufficient that Biovail has alleged in its complaint that defendants wrote letters "expressing specious safety concerns about the non-bioequivalence of Tiazac to Cardizem CD" and intimating that the HPB should delay or deny approval of Tiazac based on bioequivalence grounds when they were allegedly well aware that Tiazac did not present any safety or efficacy concerns. *See* Compl.

¶¶ 47–48. This was done, Biovail alleges, "for the sole purpose of causing a delay in the approval of Tiazac and thereby preserving the Hoechst Group's monopoly over their sustained release diltiazem products both in the United States and in Canada." *Id.* ¶ 50. Indeed, it appears from a brief review of the two letters that defendants advised the HPB that, *inter alia*, Tiazac and Cardizem CD differ in pharmacokinetics, apparent efficacy in hypertension, and lack of safety and efficacy data in angina, *see* Spears Decl., Exh. A at 2, that "Tiazac and Cardizem CD have different pharmacokinetic and pharmacodynamic properties which make them different and non-equivalent in clinical terms[,]" *id.,* Exh. B at 1, that some uses of Tiazac would "raise[ ] serious public health problems[,]" and that "because of the non-equivalence of Tiazac with Cardizem CD, special considerations need to be accorded before a Notice of Compliance is issued . . . ." *Id.,* Exh. B at 2.

At the pleading stage of this case, without discovery and the benefit of expert or scientific evidence, this court cannot and will not evaluate: whether these statements, or others, were scientifically false, or otherwise misleading; whether the issues presented to the HPB by defendants were relevant (i.e. the non-equivalence of Tiazac to Cardizem CD); whether the issues were raised with the sole intent to delay approval; or whether, in fact, defendants had any right to be petitioning the HBP at all. Suffice it to say that the complaint alleges that defendants petitioned the HPB with "bogus" concerns about Tiazac with the sole intent to delay Tiazac's approval and maintain their monopoly over sustained release diltiazem products. On a motion on the pleadings, that is enough.

Defendants' second argument that the letters to the HPB cannot form the basis

---

6. Although defendants' moving brief seems to treat the allegations regarding the HPB approval process only in the context of a breach of contract claim, defendants apparently realize that these allegations are also asserted with respect to Biovail's antitrust claims, *see* Pl.Opp.Br. at 22, as their reply brief argues that the allegations are "simply insufficient to support either a breach of contract or antitrust claim." Defs. Reply Br. at 8.

for an antitrust violation because they did not violate the Settlement Agreement and, therefore, are not wrongful, can be disposed of quickly. For the reasons discussed previously in the context of the FDA letters, *see supra* 764–65, the means by which an antitrust violation is effectuated need not be wrongful for reasons extrinsic to the antitrust laws. *See American Tobacco*, 328 U.S. at 809, 66 S.Ct. 1125. Thus, the letters to the HPB can support Biovail's antitrust claims regardless of whether they were explicitly proscribed by the Settlement Agreement.

Finally, defendants assert that the chain of causation between their acts and Biovail's alleged injury is "irrevocably destroyed" because evaluating the chain would necessarily entail questioning the correctness of the regulatory approval decision of a foreign sovereign, namely the Canadian HPB. Defs.Rep.Br. at 9–10. Again, this court does not agree.

 This court will not, under the "act of state" doctrine, "inquir[e] into the validity of the public acts of a recognized sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). At this point, however, it does not appear that Biovail is challenging the activities of the HPB or probing into its motives. Rather, Biovail is contending that defendants are liable for the actions that they took in trying to impermissibly influence the HPB. Absent an assertion of immunity, which has not been asserted here, defendants are not insulated from liability simply because their allegedly anticompetitive conduct was directed at a foreign government's regulatory process. *See Continental Ore*, 370 U.S. at 706, 82 S.Ct. 1404 (stating that

defendants were not insulated from antitrust liability simply because "their conspiracy involved some acts by the agents of a foreign government"); *see also City of Long Beach v. Standard Oil Co. of Cal.*, 872 F.2d 1401, 1408–09 (9th Cir.1989) (finding that government's ratification of prices which were set artificially low due to defendants' unlawful conspiracy does not break the chain of causation), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). Whether defendants' actions actually caused Biovail's injury— i.e. whether, but for defendants' conduct, there would not have been a delay in the Canadian regulatory process—is a matter which will not be decided on the pleading.[7]

### d. Litigation Threats

 Biovail next alleges that defendants "publicly threatened" to bring a patent infringement suit despite a covenant not to sue, in contravention of the Sherman Act. Threats of baseless litigation can constitute improper anticompetitive conduct for purposes of the antitrust laws. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir.1985) (holding that "the threat of unfounded trade secrets litigation in bad faith is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven"), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

Defendants argue that this allegation cannot support Biovail's antitrust claims because Biovail has not suffered an antitrust injury as a result of this conduct. As noted above, Biovail need not have been injured by each of the actions which would aid a trier of fact in determining whether defendants were wilfully maintaining or

---

7. As stated previously, Biovail also alleges that "similar bogus concerns were voiced by the sales representatives of defendant Hoechst–USA in the United States." Compl. ¶ 54. As defendants have not addressed this contention, this court will assume that they do not challenge it as support for Biovail's antitrust claims. *See National Assoc. of Phar-*

*maceutical Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916–17 (2d Cir.1988) (holding that manufacturer of brand name products sending letter to pharmacists which contained false and disparaging comments about generic brand products could support a Section 2 claim).

attempting to acquire monopoly power in contravention of the Sherman Act. In any event, Biovail has alleged that it was injured by the specious litigation threats. In its complaint, Biovail states that the "specious threats made by [defendants] were intended to weaken and damage Biovail's stature in the marketplace by keeping the price of Biovail's stock depressed and by putting pressure on Biovail's investors and shareholders." Compl. ¶ 61. That allegation suffices on a motion to dismiss.

### e. Proposal to Biovail

■ Finally, Biovail alleges that a representative of Hoechst–USA met with Biovail on August 1, 1997 and set forth a proposal which Biovail characterizes as an attempt to engage Biovail in "an illegal restraint of trade." The representative allegedly suggested that defendants would refrain from instituting a patent infringement suit against Biovail if Biovail agreed to delay the launch of its generic form of Cardizem CD until at least July 1999. *See* Compl. ¶ 69. Biovail declined the offer.

Defendants assert that (1) Biovail has suffered no injury from this alleged proposal because Biovail rejected the proposal; and (2) the statements made by defendants' representative on August 1, 1997 were in the context of settlement negotiations and, therefore, are inadmissible under Fed.R.Evid. 408.

Again, regardless of whether Biovail suffered injury from that proposal, and in light of the other allegations, the fact—if fact it be—that the proposal was made could well provide support for Biovail's assertion that defendants unreasonably restrained trade or were wilfully attempting to obtain or maintain a monopoly. Moreover, the fact that Biovail rejected the alleged proposal is not dispositive as to whether that proposal violated the antitrust laws. In *United States v. American Airlines*, 743 F.2d 1114 (5th Cir.1984), *cert. dismissed*, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985), for example, the Court

of Appeals for the Fifth Circuit found that plaintiff had stated a claim for attempted monopolization under Section 2 of the Sherman Act when American Airlines suggested to Braniff that they engage in a price-fixing conspiracy, even though Braniff rejected the offer. *Id.*

This court also rejects defendants' contention that the alleged statements by defendants' representative cannot be considered in connection with Biovail's Section 2 claim because they were made in the context of settlement negotiations and are, therefore, inadmissible under Fed.R.Evid. 408. It is simply too early to address the admissibility of evidence.

First, the parties dispute whether the statements were made in the context of settlement negotiations and "were intended to be part of the negotiations or compromise" as required by Fed.R.Evid. 408. *See Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir.1981). Biovail contends that the statements "took place during a regular business meeting between the parties," Pl.Opp.Br. at 22 n. 37, while defendants disagree, pointing, *inter alia*, to the fact that the statements were made only days after Biovail filed suit against defendants, *see* Defs. Reply Br. at 10–11. It would be inappropriate to decide this issue at this time.

In addition, the cases which defendants cite for their contention that on deciding a dispositive motion, the court may look to the rules of evidence to ascertain which evidence would be admissible at trial, are clearly inapposite. Both *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458 (3d Cir.1989) and *W.P. v. Poritz*, 931 F.Supp. 1199 (D.N.J.1996), *rev'd*, 119 F.3d 1077 (3d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), involved motions for summary judgment and made the unremarkable point that only admissible evidence may be used in support of a motion for summary judgment. This is not a motion for summary judgment and any contention that

only admissible evidence can be considered on a motion to dismiss is ludicrous in light of the fact that a motion to dismiss is to be decided on pleadings which themselves are not admissible.

Thus, evaluating the allegations as a whole as mandated by *Continental Ore,* and viewing them in the light most favorable to Biovail, this court finds that Biovail has adequately pleaded violations of Section 1 and 2 of the Sherman Act.

### 2. Antitrust Injury and Standing

Having found that Biovail has adequately pleaded violations of the Sherman Act, this court must now address whether Biovail has suffered antitrust injury as a result of the violations such that it has standing to bring this action.

Biovail cannot maintain a private action under the Sherman Act simply by alleging anti-competitive behavior. The right to maintain a private cause of action for damages or injunctive relief due to violations of the Sherman Act stems from Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, respectively. In order to recover damages or seek injunctive relief, a party must have suffered, or be threatened with, antitrust injury. *See* 15 U.S.C. §§ 15(a), 26; *see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, standing to bring an antitrust claim requires antitrust injury. *See Associated General Contractors of Ca. v. California State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Barton & Pittinos, Inc. v. Smith-Kline Beecham Corp.,* 118 F.3d 178, 182 (1997) (stating that "antitrust injury is more than a component to be factored in a standing analysis, it must be present in every case") (citation omitted). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690.

Biovail has adequately pleaded that it suffered injury from defendants' antitrust violations. The complaint alleges that defendants' various anticompetitive acts have "foreclosed" Biovail and other potential competitors from the market for sustained release diltiazem products and the submarket for generic versions in the United States. *See* Compl. ¶ 91(c). Defendants, for example, allegedly narrowed the scope of the right of reference such that the NDA for Biovail's generic product was not included, "for the purpose of perpetuating its monopoly power over the sale of diltiazem-based antihypertension products...." Compl. ¶ 64. As a result, Biovail's NDA for a generic form of Cardizem CD was rejected. The sales representatives for defendants allegedly raised "bogus" safety concerns in the United States regarding Biovail's diltiazem product Tiazac. Compl. ¶ 54. In addition, defendants made "specious threats" that they would institute litigation against Biovail which threats were "intended to weaken and damage Biovail's stature in the marketplace by keeping the price of Biovail's stock depressed and by putting pressure on Biovail's investors and shareholders." Compl. ¶ 61. Finally, defendants allegedly delayed Tiazac's approval in Canada by over a year "for the sole purpose of ... preserving the Hoechst Group's monopoly over their sustained release diltiazem products both in the United States and Canada." Compl. ¶ 50. The injury alleged—the intentional attempt to exclude competitors from the market and maintain monopoly power—is precisely the type of injury that the antitrust laws were intended to prevent.

In addition, because Biovail is also seeking injunctive relief, this court is not troubled by the fact that Biovail has not yet in fact been injured by some of the conduct alleged, e.g. the Anarx Agreement. When seeking injunctive relief under the antitrust laws, a party need not allege actual antitrust injury, but only the *threat* of antitrust injury. *See* 15 U.S.C. § 26;

*Weiss v. York Hospital,* 745 F.2d 786, 829 (3d Cir.1984) (noting that to be entitled to injunctive relief under the Clayton Act a private party need not show actual injury but "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur") (quoting *Mid–West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 591 (3d Cir.1979)), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

Thus, given Biovail's allegations, this court cannot say at this stage of the litigation that "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim" that it has suffered antitrust injury from defendants' actions. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Indeed, "the existence of an 'antitrust injury' is not typically resolved through a motion to dismiss." *Brader v. Allegheny General Hospital,* 64 F.3d 869, 876 (3d Cir.1995).

Because Biovail has adequately pleaded violations of Sections 1 and 2 of the Sherman Act as well as the requisite antitrust injury, the motion to dismiss these claims is denied.

### B. State Law Claims

#### 1. Breach of Contract Claim

Count Three of Biovail's complaint alleges that defendants Hoechst AG, Hoechst–USA and Carderm ("contract defendants") are in breach of contract. It is unclear from the complaint, however, whether Biovail is alleging that the contract defendants allegedly breached the Settlement Agreement or the FTC Decree or both. Biovail asserts in its brief that it has sufficiently pled a breach of both the Settlement Agreement and the FTC Decree. *See* Pl.Opp.Br. at 38. The complaint, however, while referring to the FTC Decree, seems to allege only that the contract defendants' actions before the Canadian HPB and the FDA constituted a material

breach of the Settlement Agreement. *See* Compl. ¶¶ 104–05.

This murkiness need not delay this court for long, however, because even if Biovail's complaint were construed as alleging a breach of the FTC Decree, Biovail, as discussed above, does not have standing to enforce the FTC Decree. *See supra* at 762–64. Thus, a breach of contract claim based upon an alleged breach of the FTC Decree cannot be maintained by Biovail. This court will, therefore, proceed directly to Biovail's claim that the contract defendants breached the Settlement Agreement.

Biovail asserts that the contract defendants materially breached the Settlement Agreement by taking legal actions both before the Canadian HPB and the FDA to challenge and delay the regulatory approvals necessary for Biovail to sell its diltiazem products in Canada and in the United States. *See* Compl. ¶¶ 104–06. This conduct, Biovail alleges, directly violated the Settlement Agreement which provided that the contract defendants

> covenant not to sue Biovail ... or initiate any regulatory proceedings or legal actions challenging or contesting in any manner whatsoever [Biovail's diltiazem products] with respect to any claim of patent infringement ... or regulatory approvals ... now or in the future.

Spears Decl., Exh. C at 14–15; *see also* Compl. ¶ 102.

The contract defendants argue that this claim must be dismissed because the Settlement Agreement only proscribes the initiation of regulatory proceedings or legal actions. At most, the contract defendants argue, the complaint alleges that they sent letters containing "bogus" concerns to the Canadian HPB which delayed the approval of Tiazac in Canada, and informed the FDA that the right of reference granted to Biovail was much narrower than either the FDA or Biovail had anticipated. According to the contract defendants, this conduct does not constitute the *initiation* of

regulatory proceedings or legal actions proscribed by the Settlement Agreement.

In response to the contract defendants' motion to dismiss, Biovail argues that the relevant provision is not as narrow as the contract defendants claim. Rather, it argues that the provision is a "broad catch-all" which includes not only the initiation of lawsuits or formal regulatory proceedings but covers the legal actions taken by the contract defendants' lawyers in challenging the approval of Biovail's diltiazem products before the HPB and the FDA. *See* Pl.Opp.Br. at 43. Indeed, Biovail argues, the language "initiating any regulatory proceeding or legal action" cannot mean solely the formal initiation of a regulatory proceeding or lawsuit. Not only would this defeat what Biovail asserts was the general purpose of the Settlement Agreement, i.e. to facilitate the entrance of Biovail's diltiazem products into the market, Biovail argues, but it would render meaningless the preceding language in the provision which states that the contract defendants "covenant not to sue Biovail" as well as other provisions of the agreement which prohibit the filing of citizen petitions. Thus, when the agreement is read as a whole and in light of its overall purpose, Biovail argues, the challenges brought by the contract defendants before the Canadian HPB and the FDA fall within its purview.

A settlement agreement is to be interpreted in accordance with general principles of contract law. *See Constitution Bank v. Kalinowski,* 38 F.Supp.2d 384 (E.D.Pa.1999). In interpreting a contract provision, the "polestar ... is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." *Halper v. Halper,* 164 F.3d 830, 840 (3d Cir.1999) (quoting *Atlantic Northern Airlines v. Schwimmer,* 12 N.J. 293, 301, 96 A.2d 652 (1953)).[8] The search for the intent of the parties does not require an inquiry into the subjective intent of the parties, "but rather centers on the intent embodied by the language that the parties chose to memorialize their agreement." *Williams v. Metzler,* 132 F.3d 937, 947 (3d Cir.1997). "Under New Jersey law, courts should interpret a contract considering 'the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" *SmithKline Beecham Corp. v. Rohm and Haas Co.,* 89 F.3d 154, 159 (3d Cir.1996) (citation omitted).

The first step in ascertaining the objective intent of the parties is to determine whether a contract term or provision is clear or ambiguous. If a term or provision is ambiguous, its interpretation is relegated to the fact finder. *See Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co.,* 124 F.3d 508, 523 (3d Cir.1997). Ambiguity itself, however, is a question of law. *See Teamsters Industrial Emp. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 n. 2 (3d Cir.1993).

"An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Assisted Living of Moorestown, L.L.C. v. Moorestown, Twp.,* 31 F.Supp.2d 389, 398 (D.N.J.1998) (citation omitted). To determine the existence of ambiguity, the court must "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Teamsters Industrial,* 989 F.2d at 135. "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Id.* The court is to

---

8. The Settlement Agreement expressly provides that it is governed by New Jersey law. *See* Spears Decl., Exh. C ¶ 12.

"consider what was written in light of the circumstances under which it was written, and give to the language a rational meaning consistent with the expressed general purpose." *Dontzin v. Myer*, 301 N.J.Super. 501, 507, 694 A.2d 264 (App.Div.1997).

■■■ At this juncture, and construing all facts in favor of Biovail, it is simply too early to determine whose interpretation of the relevant provision is correct or even whether the provision is sufficiently ambiguous to warrant referral to the factfinder. The contract defendants' interpretation that the provision only applies to the initiation of formal regulatory or legal proceedings is certainly reasonable in light of the language of the provision. However, this court cannot say that the "plain meaning of a contract phrase ... spring[s] unambiguously from the page...." *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987). Indeed, Biovail has set forth a compelling argument that the contract defendants' narrow interpretation would conflict with what it asserts was the purpose of the Settlement Agreement and would also render other passages of the agreement mere surplusage. Moreover, New Jersey law provides that this court may look to extrinsic evidence "even when the contract on its face is free from ambiguity." *American Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir.1995) (quoting *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 301, 96 A.2d 652 (1953)). One looks to extrinsic evidence because "the law recognizes that the meaning of words can depend on context, and what may seem unambiguous without context (or in the context that the judge may hypothesize, based on his or her own experience) may be ambiguous when understood from 'the linguistic reference point of the parties.'" *Id.* Thus, erring on the side of caution, this court will allow this claim to proceed past the pleadings. After some discovery, however, this court will be able to more readily ascertain the objective intent of the parties by evaluating the express language of the provision in light of the purpose of the Settlement Agreement and the circumstances surrounding its formation, and by permitting the parties to proffer relevant extrinsic evidence, if appropriate. Indeed, even the cases cited by the contract defendants in support of their assertion that this is the appropriate time to evaluate the agreement are cases which have progressed to the summary judgment stage.[9]

### 2. Unfair Competition Claim

■■■ Finally, Biovail alleges in Count Five of its complaint that defendants' conduct described throughout the complaint constitutes unfair competition under state common law. *See* Compl. ¶ 12.[10] Defendants argue that this claim must be dismissed because (1) the allegations do not establish that New Jersey law would apply to Biovail's unfair competition claim; and (2) Biovail does not sufficiently allege facts constituting unfair competition. Defendants are wrong.

---

9. In its brief, but not its complaint, Biovail asserts for the first time that, even if the conduct of the contract defendants did not violate the express terms of the agreement, the conduct constitutes a breach of the implied covenant of good faith and fair dealing which inheres in every contract. *See* Pl. Opp.Br. at 44–46. This court need not now address this claim because "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.1988) quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. de-*

*nied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

10. The complaint alleges that defendants' conduct constitutes unfair competition under the common law of New Jersey and "the other States of the Union." Compl. ¶ 112. Defendants quarrel with the vagueness of this claim because no state beyond New Jersey is specified. *See* Defs.Br. at 31 n. 34. It is not uncommon, however, for state common law claims to be pleaded without reference to which law will ultimately govern the claim.

Taking the choice of law argument first, the threshold inquiry in a choice of law analysis is to determine whether an actual conflict exists between two bodies of law. *See Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir.1993) ("Generally speaking, before a choice of law question arises there must be an actual conflict between the two applicable bodies of law."); *National Utility Service, Inc. v. Chesapeake Corp.*, 45 F.Supp.2d 438 (D.N.J.1999) (addressing first whether a true conflict existed between Pennsylvania and New Jersey law "[b]ecause there is a choice of law issue only if the laws of those two states differ[ ]"); *Score Board, Inc. v. Upper Deck Co.*, 959 F.Supp. 234, 238 n. 4 (D.N.J.1997) (stating that "[t]he initial step in [a choice of law analysis] is to determine whether a conflict exists between the laws of the interested states").

Because unfair competition is a business tort, if a conflict exists this court would apply a governmental interest analysis to resolve which law applies. *See Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187 (1986) (noting that in New Jersey, a governmental interest analysis is used to determine choice of law questions in tort cases). The two-step governmental interest analysis entails "determin[ing] the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction." *Dent v. Cunningham*, 786 F.2d 173, 176 (3d Cir.1986) (quoting *Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 33 (3d Cir. 1975)). "A state is deemed interested only where application of its law to the facts in issue will foster that state's policy." *Id.* "This analysis does not count up the factual contacts with the respective states ... and make a quantitative determination of which state law should apply. Instead, 'the qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant.'" *Pine v. Eli Lilly &*

*Co.*, 201 N.J.Super. 186, 192, 492 A.2d 1079 (App.Div.1985) (citation to quotation omitted).

Defendants' request that this court engage in a lengthy choice of law analysis under the governmental interests test, ultimately conclude that New Jersey law does not apply to Biovail's unfair competition claim, and, thereafter, dismiss the claim is wholly inappropriate. For starters, the analysis cannot be performed at this point in part because defendants have failed to allege any *other* jurisdiction's laws which would potentially control Biovail's common law unfair competition claim. *See Henry v. Richardson–Merrell*, 508 F.2d 28, 34 n. 14 (3d Cir.1975) (noting that "[t]he parties having failed to plead the law of any other jurisdiction [which would be interested in this case], it is not incumbent on the court to do so"). This makes it impossible to perform the initial inquiry of whether a conflict of laws between New Jersey and another state does, in fact, exist. In addition, without discovery, this court would be hard pressed to adequately evaluate even the sufficiency of the factual contacts with New Jersey involved in this case. *See El–Maksoud v. El–Maksoud*, 237 N.J.Super. 483, 491, 568 A.2d 140 (1989) (noting that "without discovery, any evaluation of what law applies to this case would also be premature").

Finally, even if New Jersey law were not to apply to Biovail's unfair competition claim, it does not follow that dismissal is warranted. A choice of law analysis may result in a claim being dismissed but only if the court determines, by employing such an analysis, that another state's law applies to the claim and that under *that* law, the claim is unsustainable. *See, e.g., Hoffman Equipment, Inc. v. Clark Equipment Co.*, 750 F.Supp. 1222, 1233 (D.N.J.1990) (dismissing the claim because Virgin Islands law applies instead of New Jersey law *and* it was conceded that under Virgin Island law, defendant is not liable).

■ Defendants' second argument that, even if New Jersey law applies, the facts alleged do not constitute unfair competition because the conduct alleged was not "injurious and otherwise unfair, improper and wrongful" is also summarily rejected. *See* Defs.Br. at 33–34. Indeed, having found that the conduct alleged by Biovail constitutes, at least on the pleadings, possible antitrust violations, it is fair to say that the conduct states a claim under the much broader common law tort of unfair competition. *See* Restatement (Third) of Unfair Competition § 1 cmt. g (1995) (engaging in "an unlawful restraint of trade" constitutes unfair competition).

Accordingly, defendants' motion to dismiss Biovail's state law claims is denied.

## C. Motion to Dismiss filed by Individual Defendants

Although joining in the general motion to dismiss filed by all defendants, the Individual Defendants have filed a separate motion to dismiss setting forth independent grounds for dismissal of the antitrust and unfair competition claims brought against them.

■ The Individual Defendants first argue that Biovail fails to allege knowing participation in the wrongdoing with appropriate specificity and, therefore, the claims against them must be dismissed. Dismissal is not warranted, at least at this juncture.

Even assuming that knowing participation is required for liability to attach, Biovail has adequately pleaded that the Individual Defendants knowingly participated in the wrongdoing alleged. A plaintiff need not plead its antitrust claims with particularity. *See MCM Partners, Inc. v. Andrews–Bartlett & Associates,* 62 F.3d 967, 976 (7th Cir.1995) ("an antitrust plaintiff need not include 'the particulars of [its] claim' to survive a motion to dismiss") (citations omitted). Federal Rule of Civil Procedure 8(a), requiring plaintiff to provide a short and plain statement of its claim showing that it is entitled to relief, "applies with equal force in antitrust cases." *Delaware Health Care, Inc. v. MCD Holding Co.,* 893 F.Supp. 1279, 1284 (D.Del.1995).

The complaint alleges, among other things, that the Individual Defendants

> were at all times, collectively or individually, as the case may be, the guiding or alter ego of the defendants Hoechst AG, Hoechst–North America, and Hoechst–USA. They collectively conceived, approved and adopted the schemes, plans and illicit activities that are [described in the complaint]. Moreover, they influenced and ultimately led the [other defendants] to commit to, and implement, the various unlawful conspiracies and actions [set forth in the complaint].

Compl. ¶ 10. While there are only occasional references in the complaint to specific actions taken by the Individual Defendants, *see, e.g.,* Compl. ¶ 79 (stating that defendant Markham oversaw and approved the Andrx Agreement); Compl. ¶ 47 (alleging that defendant Belle sent a letter raising "bogus safety concerns" to the HPB), Biovail need not plead the "meetings or phone calls at which [the antitrust violation] was carried out...." *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 202 (3d Cir.1991). Rather, the complaint need only allege the "participants, purpose and motive" to survive a motion to dismiss. *Id.* Accepting the factual allegations in the complaint and drawing all reasonable inferences in favor of Biovail, this court cannot say at this time that Biovail can prove no set of facts which would establish knowing participation.

This is not to say that the claims against the Individual Defendants will ultimately be successful but only that discovery is warranted. Indeed, after engaging in preliminary discovery, Biovail has already ascertained that defendant Ladell executed the Andrx Agreement. *See* Pl.Opp.Br. at 60 n. 95. As the Supreme Court has stated, "in antitrust cases, where the proof is largely in the hands of the alleged conspir-

ators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (citations and internal quotations omitted).

### III. Conclusion

For the above mentioned reasons, the motions to dismiss the complaint are denied. An appropriate order will issue.